

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————

DEBBIE MEPHAM, MARIE HOULE,
JESSICA MANNING, CHERI WILLIAMS,
TERRI McCLURE (FAULKNER),
JILL SABLE, JULIE CHURCHILL,
KRISTINE SHAFER, ERICA VREDEVELT,
and PAM SMITH,

      Plaintiffs,

v                                     Case No. 1:02-cv-895

WACKENHUT CORRECTIONS              HON. ROBERT HOLMES BELL
CORPORATION, a/k/a "WCC,"

      Defendants.

———————————————————

Ann M. Stuursma (P41412)
PERRY & STUURSMA, LLP
Attorneys for Plaintiffs Mepham, Houle, Manning,
McClure, Churchill, & Shafer
15 Ionia, N.W., Suite 510
Grand Rapids, MI 49503
(616) 776-3900

Frederick J. Boncher (P23072)
Brent W. Boncher (P64832)
SCHENK & BONCHER
Attorneys for Plaintiffs Sable, Williams,
Vredevelt, and Smith
601 Three Mile Road, N.W.
Grand Rapids, MI 49544
(616) 647-8277

Kenneth H. Adamczyk (P40602)
BUTZEL LONG
Attorneys for Defendant
Suite 200
100 Bloomfield Hills Parkway
Bloomfield Hills, MI 48304
(248) 593-2095

———————————————————

## PLAINTIFFS JILL SABLE, CHERI WILLIAMS, ERICA VREDEVELT AND PAM SMITH'S AMENDED COMPLAINT

NOW COME the Plaintiffs, Jill Sable, Cheri Williams, Erica Vredevelt, and Pam Smith by and through their attorneys, SCHENK & BONCHER, and state as follows:

### General Allegations

1.  Plaintiff Jill Sable is a resident of Manistee County, Michigan, and resides at 22060 Hoxeyville Road, Wellston, Michigan 49689.

2.  Plaintiff Cheri Williams is a resident of Kent County, Michigan, and resides at 22460 Three Mile Road, Reed City, Michigan.

3.  Plaintiff Erica Vredevelt is a resident of Kent County, Michigan, and resides at 936 S. Ottillia, S.E., Grand Rapids, Michigan 49505.

4.  Plaintiff Pam Smith is a resident of Osceola County, Michigan, and resides at 35471 - 155th Avenue, Hersey, Michigan.

5.  Defendant Wackenhut Corrections Corporation (hereinafter "Wackenhut") is located at 4260 Wackenhut Drive, Palm Beach Gardens, Florida and operates the Michigan Youth Correctional Facility, a Michigan Department of Corrections Facility, at 1805 W. 32nd Street, Baldwin, Michigan.

6.  Plaintiffs Sable, Williams, Vredevelt, and Smith were at all times relevant to this Amended Complaint employees of the Michigan Youth Corrections Facility run by Wackenhut.

7.  Wackenhut is vicariously responsible for the acts of its employees indicated herein as the acts were within the scope of employment, and Wackenhut had the right and responsibility to control and direct these employees.

-2-

8.    Wackenhut knew of the harassment, discrimination, false imprisonment, wrongful discharge, and defamation alleged in this Amended Complaint and took no or inadequate action to undo the wrongs perpetrated, mitigate the damages, change its policies, or discipline or fire those responsible.

## Count I - Retaliatory Employment Practices Against Plaintiff Sable: Wackenhut

9.    Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 8 above as if fully set forth herein.

10.    Defendant Wackenhut employed Plaintiff Sable since its opening as the personnel manager of the Human Resources Department.

11.    Plaintiff Sable only received excellent performance reviews throughout her years of employment at Wackenhut until her most recent evaluation which rated her at competent.

12.    Plaintiff Sable was subjected to harassment by her most recent boss, Warden Frank Elo and others for months preceding her termination.

13.    Plaintiff Sable was asked by Warden Elo to disregard company policy on a number of issues, and she refused.

14.    Plaintiff Sable became a whipping post for abuse by Warden Elo and other executive supervisors at Wackenhut.

15.    Warden Elo simply disliked Plaintiff Sable and looked for any opportunity to get rid of her.

-3-

16.    Warden Elo wished to have a younger, less knowledgeable, or experienced personnel manager in Plaintiff Sable's position that would not know enough to realize his demands were contrary to company policy or federal law and would simply acquiesce to his authority.

17.    Warden Elo was open in his dislike for Plaintiff Sable stating to his executive staff, "We will put her in her place."   He also attempted to demote her and transfer her.  He also sabotaged her work.

18.    As a result of the abuse at work, Plaintiff Sable began to suffer emotionally.  She began to see a psychologist in Spring 2002 for depression and stress.

19.    By early-April 2002, Plaintiff Sable's work environment was psychologically unbearable.  On April 14, 2002, Plaintiff Sable filed for workers' compensation benefits.

20.    Plaintiff Sable was terminated shortly thereafter on June 20, 2002, in retaliation for the filing for workers' compensation benefits and for refusing to act contrary to company policy or federal law.

21.    Firing an employee in retaliation for filing a workers' compensation claim is contrary to the public policy of the State of Michigan as codified in MCL 418.301(11) (see Sventko v Kroger, 69 Mich App 644 [1976]; Lamoria v Health Care and Retirement Corp, 233 Mich App 560 [1999]; Phillips v Butterball Farms Co Inc, 448 Mich 239 [1995]).

WHEREFORE, Plaintiff Sable respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage

-4-

losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

## Count II - Defamation of Plaintiff Sable

22.     Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 21 above as if fully set forth herein.

23.     Warden Elo and Deputy Warden Ibezim made an effort to intentionally defame Ms. Sable in front of other employees.

24.     Specifically, Warden Elo ridiculed Plaintiff and described her as incompetent publically and said she was not doing her job.

25.     Warden Elo referred in interoffice memoranda that Plaintiff was incompetent and not worthy of trust.

26.     Warden Elo stated Ms. Sable was trying to bring about the demise of the facility.

27.     Deputy Warden Ibezim publicly and loudly described Ms. Sable as incompetent at an executive staff gathering at a local restaurant.

28.     Warden Elo and Deputy Warden Ibezim would fabricate events to support their statements.

29.     Warden Elo and Deputy Warden Ibezim were aware that their statements were false.

30.    Warden Elo and Deputy Warden Ibezim's statements tarnished Ms.

Sable's reputation generally and they also attacked her professional

reputation.

WHEREFORE, Plaintiff Sable respectfully requests this Court to award monetary

damages as it deems appropriate, including recovery for pain and suffering, wage

losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any

other relief this Court deems proper.


## Count III - Intentional Infliction of Emotional Distress of Plaintiff Jill Sable

31.    Plaintiffs reallege and reincorporate by reference each and every

allegation contained in Paragraphs 1 through 30 above as if fully set forth

herein.

32.    In addition to events described elsewhere in this Complaint, Defendants

would give Plaintiff Sable numerous assignments on short notice with the

same deadlines in an attempt to cause her stress and to generally harass

her.

33.    Furthermore, Defendants would intentionally withhold information and

materials necessary to perform Plaintiff's job until the last minute with the

intent of causing Ms. Sable increased distress.

34.    Deputy Warden Bosse also would fabricate pointless tasks intentionally

hindering Plaintiff Sable from doing her work, and require Ms. Sable to

reread notes out loud to him in attempts to increase Ms. Sable's work load and stress.

35.    Defendants' conduct was extreme and outrageous.

36.    Defendants' acts have caused Plaintiff Sable to suffer severe emotional distress.

37.    Defendants' conduct has resulted in psychological damage to Plaintiff Sable  which requires her to see a psychologist on a regular basis and has left her unable to work.

WHEREFORE, Plaintiff Sable respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

### Count IV - Elliott-Larsen Discrimination of Plaintiff Sable

38.    Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 37 above as if fully set forth herein.

39.    Plaintiff Sable was treated differently than men who were similarly situated.  MCLA 37.202 et seq.

40.    Plaintiff Sable was given duties by Wackenhut, especially Warden Elo, that were outside of and beyond the scope of her duties as set forth in her job description.  Male counterparts were not given any extra duties.

41.    Plaintiff Sable was evaluated based upon these disparate duties.

-7-

42.    Plaintiff Sable was further given unattainable goals unlike her male counterparts.

43.    Plaintiff Sable was given more numerous job objectives than her male counterparts.

44.    The support staff and resources were denied to Plaintiff Sable that were afforded to male supervisors similarly situated.

45.    Plaintiff Sable was given no feedback on her performance unlike the male supervisors who were supported and coached by senior staff, especially Warden Elo.

46.    Plaintiff Sable was paid less than similarly situated male supervisors and was, in fact, the lowest paid supervisory administrator at Wackenhut.

47.    Plaintiff Sable's supervisors (mainly Warden Elo) did not afford her the opportunities to meet and consult with them that were necessary to carry out her job duties and perform her job goals and objectives, whereas other male supervisors were provided ample counsel.

48.    The intent of this discrimination was to make Plaintiff Sable appear incapable, unreliable, and incompetent.

49.    As a result of this discrimination, Plaintiff Sable has suffered severe mental distress, has lost the respect of her co-workers, and has lost her job.

50.    The acts described herein reference an intent to discriminate or at least a reckless indifference to Plaintiff's civil rights.

WHEREFORE, Plaintiff Sable respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

## Count V - Wrongful Employment Termination of Plaintiff Sable

51.    Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 50 above as if fully set forth herein.

52.    Warden Elo ordered Plaintiff Sable to pay a favored male salaried employee overtime in addition to his salary in violation of the Fair Labor Standards Act (FLSA).

53.    Warden Elo directed Plaintiff Sable to make deduction from salaried employees wages for reasons which violated 29 CFR 541.118 such as short absences for doctor's appointments.

54.    Plaintiff Sable reported these violations of federal regulations and law to Wackenhut.

55.    Warden Elo asked Plaintiff Sable to violate other employee's civil rights by discriminately enforcing the FLSA in a thinly-veiled endeavor to harass protected classes of persons employed by Wackenhut in violation of labor laws and regulations such as 29 CFR 825.220.

56.    Plaintiff Sable, as personnel manager, had a duty to maintain compliance of these laws and a duty to report said violations to Wackenhut.

57.   Plaintiff Sable refused to violate the provisions of the federal labor laws and federal and state civil rights laws.

58.   Plaintiff Sable was fired by Warden Elo for reporting these violations and for refusing to violate said federal laws.

59.   Plaintiff Sable's termination is unlawful as it runs contrary to Michigan Public Policy considerations (see Garavaglio v Centra Inc, 211 Mich App 625, 630 [1995]) "– a cause of action has been found where the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment"; see also Meury v Kalitta, 181 F3d 102 [1999] [unpublished]).

60.   In the alternative, Defendant's actions are unlawful as they violate the FMLA 29USC § 2611 et seq.

WHEREFORE, Plaintiff Sable respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

## Count VI - Defamation of Plaintiff  Williams

61.   Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 60 above as if fully set forth herein.

62.   Plaintiff Williams was stationed in the "control" area with Lt. Guiterrez looking over the roster book to sign up for available overtime shifts per

customary procedure.  The "control" area is the room from which prison activities are monitored and administrative tasks performed.  The roster book is usually locked up there.  The roster books contains the shifts and shift assignments for the employees.  Employees may sign up for open shifts as indicated in the roster book for overtime.

63.    After looking the book over in the presence of Lt. Guiterrez, as he was leaving, Plaintiff Williams reminded him to lock up the book as it was his responsibility.

64.    Lt. Guiterrez refused and left.

65.    The following day, Lt. Guiterrez yelled and screamed about Plaintiff Williams in the presence of all other control room staff falsely accusing Plaintiff Williams of breaking into his locker and stealing the roster book.

66.    Lt. Guiterrez also authored a memo to the warden making the same accusations.

67.    Lt. Guiterrez later apologized to Plaintiff Williams privately when she confronted him about his accusations.

68.    The accusations constitute defamation per se as they relate to the commission of a crime.  (MCL 600.2911[1]).

69.    The verbal accusations and the memoranda also are defamatory of Plaintiff Williams with regard to her profession and occupation and amount to defamation per se in this manner as well.  (MCL 600.2911[2]).

70.    This defamation inferred that Plaintiff Williams could not be trusted at work and was dishonest in her employment capacity.

-11-

71.  Lt. Guiterrez made the statement and wrote the memorandum with knowledge of the falsity of their content and with the intent to injure the reputation of Plaintiff Williams.

72.  On another occasion, Warden Elo ordered the prisoners out of their cells.

73.  Warden Elo was intentionally causing chaos and frustration for the guards (including Ms. Williams) who were thereby hampered in performing the required periodic inmate counts.

74.  When the inmate counts were incorrect, Warden Elo berated Ms. Williams calling her incompetent,  among other things,  in front of other guards.

75.  Warden Elo's statement(s) were intentional attempts to tarnish Ms. Williams' reputation and constitute defamation.

76.  Warden Elo's statement(s) were made with the knowledge of their falsity.

77.  This act contributed to the offensive atmosphere at Wackenhut resulting in her constructive discharge.

78.  Wackenhut is responsible for the defamatory statements by Warden Elo and Lt. Guiterrez by respondeat superior as the statements were made while discharging their duties as Wackenhut's agents.

WHEREFORE, Plaintiff Williams respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

## Count VII - False Imprisonment of Plaintiffs
## Cheri Williams, Erica Vredevelt, and Pam Smith

79. Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 78 above as if fully set forth herein.

80. At the end of their shift, and on more than one occasion for Plaintiffs Williams, Vredevelt and Smith, along with other corrections officers, were locked in a room by supervisors intending to keep them there until one would volunteer to work the following shift as well (a double shift).  This would occur when Defendant was short-staffed on the incoming shift.

81. Additionally, the car keys of Plaintiff Williams and the other corrections officers on the shift with her were withheld from them until one of them volunteered to continue working.

82. No means of reasonable escape or retreat was afforded.

83. During their false imprisonment, Plaintiffs Williams, Smith, and Vredevelt were upset, and the incident(s) have caused them mental distress since.

84. Plaintiffs Williams, Smith and Vredevelt were fully aware that they were not able to leave during their false imprisonment.

85. These acts were intentional, intended harm, and were carried out with full knowledge that they were acting to harm Plaintiffs.

86. These actions contributed to the offensive atmosphere at Wackenhut resulting in their constructive discharge.

WHEREFORE, Plaintiffs Williams, Smith and Vredevelt respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

### Count VIII - Sexual Discrimination and Hostile Work Environment Under Elliott-Larsen Civil Rights Law of Plaintiffs Cheri Williams, Erica Vredevelt and Pam Smith

87.     Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 86 above as if fully set forth herein.

88.     These acts set forth below contributed to the offensive atmosphere of Wackenhut resulting in Plaintiffs Williams, Vredevelt and Smith's constructive discharge.

89.     These actions set forth in this Count represent an intent by Wackenhut to discriminate against women on the conditions and terms of their employment and harass and intimidate them.  At the very least they demonstrated pervasiveness of such an attitude of discrimination by their outrageousness and number that Wackenhut must have had a reckless indifference to the acts of their employees and supervisors.

90.     As a result of the discrimination and harassment set forth in this Count, Plaintiffs have suffered severe emotional distress as well as intimidation, humiliation, and embarrassment.

-14-

## A. Discrimination of Work Assignments of Plaintiffs Williams, Vredevelt and Smith

91.  Women were unlawfully discriminated against as to work assignments in the Wackenhut Prison as compared to similarly situated men.

92.  While Plaintiffs Cheri Williams, Erica Vredevelt, and Pam Smith were employed by Defendant, men corrections officers were given the more desirable, more respected, more authoritative and more exciting positions. The women were assigned to areas like "control" (the main office and monitoring room of the prison), and POD (being confined to a cell block to supervise it).

93.  Lt. Greg Griffin told Plaintiff Williams that women were not capable of controlling the prisoners, and "no women will go on a cell rush," and thus no women were allowed in the upper "utility" positions (which, along with the "CERT" positions controlled prisoner conflicts).

94.  Plaintiff Smith was also generally denied such opportunity for work in upper utility positions and work on CERT.

95.  This discrimination occurred despite the fact that the men and women working at Wackenhut are given the same training, must pass the same corrections officers academy, and must meet the same qualifications required for men.

96.  In fact, Plaintiffs Williams and Smith are more qualified in handling prisoners than many male corrections officers given their prior years of experience as police officers on the street.

-15-

97.    On one occasion, after complaints from the female officers that they were never given nor allowed the leadership positions of the "utility" assignments which dealt with prisoner control, the supervising men decided to "teach the women a lesson."   Prior to that occasion, women had not been assigned to these types of positions.  That day the male officers in charge assigned only women to all the prisoner control related utility positions.

98.    That day there was a prison fight.

99.    Plaintiff Smith, who had been assigned one of these prisoner control positions was forced to break up the fight, nearly on her own, jeopardizing her health and safety.

100.    Normally, when there is a prison fight, other corrections officers, supervisors, and lieutenants assist the corrections officers assigned to "utility"  to quell the prisoner unrest when their aid is sought.  That day, Plaintiff Smith requested assistance and none was given to her by the other officers (male) who were nearby and available.

101.    In fact, these officers stated "you're on your own."

102.    Such conduct exhibited clear discrimination based on sex/gender.

## B. Discriminatory Discipline/Wrongful Discipline:
### Plaintiff Smith

103.  Plaintiff Smith was also written up for insubordination on an occasion where Lt. Griffin ordered the "POD" inmates to be fed in the dining room instead of in their cells as was safer for these dangerous prisoners.

104.  On that occasion, Plaintiff Smith recognized the danger and said that that would be a great risk to those officers, especially because they were understaffed.

105.  Lt. Griffin replied by stating "you're a woman and you don't know what the hell you're talking about.  Just do it."

106.  Plaintiff Smith responded, "Yes, sir."

107.  These insubordination charges were brought solely to intimidate and harass Plaintiff Smith.

108.  The insubordination charges were dropped.

109.  Similar charges were never made against male officers despite similar inquiry to supervisors about the propriety of orders.

110.  The verbal response by Lt. Griffin is indicative of the discriminatory atmosphere against women because supervisors there believed women were inferior, incapable, and didn't belong in the corrections officer field.

### C. **Retaliation/Sexual Advances Against Plaintiff Smith**

111.    Sgt. Christopher Codden, a Wackenhut supervisor, made a thinly veiled
offer to improve the work assignments Plaintiff Smith had been receiving if
she would involve herself in a sexual relationship with him.

112.    Specifically, Sgt. Codden eased up to Plaintiff Smith, put his arms around
her, squeezed her, and stated in a solicitous manner that if she were more
"friendly" (i.e., would sleep with him) that he would assign her to the more
desirable positions.

113.    Plaintiff Smith rebuffed Sgt. Codden's advances.

114.    In retaliation for his rejection, Plaintiff Smith was thereafter assigned to
the least desirable positions for a correction officer.  These included being
assigned to "POD" and kitchen duty.

115.    Later, Sgt. Codden and Plaintiff Smith had a confrontation during which
Plaintiff Smith vehemently declared that she would not sleep with him and
that she was a married woman and wasn't going to put up with the
mistreatment any more.

### D. **Sexual Harassment: Plaintiff Williams**

116.    Wackenhut supervisors displayed a distaste for female corrections
officers and openly expressed it.

117.   Officer Daniel Bosse, in the presence of other employees, stated "That's the way I like it, only two women" (referring to the  gender make-up of a particularly incoming class of corrections officers academy graduates).

118.   When alone with Plaintiff Williams, Senior Officer Lt. Oswaldo Guiterrez stated, "Do you have any underwear on because you don't look like it?"

119.   This verbal intimidation exhibited by the example stated above was unwelcomed.

120.   These types of statements evidence the persuasive attitude at Wackenhut that women were not welcomed and were second class employees. Women  as corrections officers labored in this hostile work environment without intervention from superiors who, if anything, supported and encouraged such behavior.


**E.  Discrimination in Position Retention: Plaintiff Vredevelt**

121.   Plaintiff Vredevelt's first job as a corrections officer was at Wackenhut.

122.   Wackenhut supervisors discriminated in their treatment in assignments for female corrections officers.

123.   Plaintiff Vredevelt took extra training courses through the State of Michigan to become a Certified Emergency Response Team (CERT) member at Wackenhut.

124.   She met all the qualifications for the position.

125.   The CERT team is responsible for controlling the prisoners in emergency situations such as prison riots and other unexpected problems in the

prison, which require both force and delicacy in handling the prisoners.   It requires MDOC training, is a more prestigious position, and demands higher pay.

126.   She was promoted to a CERT position and performed her duties well until Mr. Bosse became Deputy Warden at Wackenhut.

127.   One day when Plaintiff Vredevelt was scheduled to work CERT, she showed up for her shift and was told to go home by Deputy Warden Bosse.  Deputy Warden Bosse told Plaintiff Vredevelt that her CERT status had been revoked.

128.   Plaintiff Vredevelt was denied pay for the day she came in to work her CERT shift as scheduled.

129.   No male members of the CERT team were taken off the team at any point.

130.   Being taken off the CERT team is considered a demotion and meant Plaintiff Vredevelt lost pay.

## F. Discrimination in Overtime: Plaintiff Vredevelt

131.   Also, female corrections officers were made to work longer shifts, up to 16-21 hours straight, locked in a cell block.  Male officers similarly situated were not given such marathon shifts.

### G.  Discrimination in Promotion: Plaintiff: Plaintiff Vredevelt

132.    In another instance, Corrections Officer Thomas DeWolf was promoted to sergeant ahead of Plaintiff Vredevelt after equal scoring on sergeant boards and despite Plaintiff Vredevelt having more seniority.  Mr. DeWolf did not even want the position.

133.    After inquiring as to why she had not received the promotion, Plaintiff Vredevelt was told by Deputy Warden Bosse, "women should be at home barefoot and pregnant."

134.    Deputy Warden Bosse also stated that Plaintiff Vredevelt should not be allowed to work in the "utility" capacity because, "you're a female, and you don't deserve to be on "utility."

135.    This act contributed to the offensive atmosphere at Wackenhut resulting in her constructive discharge.

### H.  Discrimination in Facilities/Sexual Harassment: Plaintiff Vredevelt

136.    Plaintiff Vredevelt was forced to undress and change clothes in the men's locker room with the male CERT members.

137.    Plaintiff Vredevelt was subject to verbal harassment when she changed clothes with the men and at other times during her job.  Such comments were made as "nice ass," and "she's fuckable."  Other comments about her body were made by her male co-workers.

138. The males in the locker room would bet to see what underwear Plaintiff Vredevelt was wearing.

139. Plaintiff Vredevelt was forced to change clothes in front of and with the men on the "CERT" team during which they would place bets on what underwear she was wearing and joke at her.  This situation was brought on by the closure of the women's locker room, leaving the female CERT team members no place to change besides the men's locker room.

I. **Discrimination in Provisions/Sexual Harassment: Plaintiff Vredevelt**

140. Plaintiff Vredevelt is allergic to polyester and standard-issue corrections officers' uniforms were made of that fabric.  Plaintiff Vredevelt was made to wear fatigues for a number of months instead of providing her a uniform despite the collective bargaining agreement which requires Wackenhut to provide uniforms and verbal promises that she would be provided a cotton uniform.

141. Given that background and understanding that her fatigues fit more loosely than the uniform would, Plaintiff Vredevelt was subject to sexual comments like one from Senior Officer Lt. Griffin, who said, "I can always see Andrews' (another female officer) camel toe, I can't see yours with your fatigues on – when are you going to get a uniform so I can see yours?"

142. Such comments were intimating, and abusive, and intended to harass Plaintiff Vredevelt.

-22-

143.   Such comments are illegal under Michigan law.

### J. Discrimination/Sexual Harassment: Plaintiff Vredevelt

144.   An additional instance of harassment and sexual intimidation came at the hand of her supervisor, Lt. Greg Guiterrez, in February of 2002, who made Plaintiff Vredevelt perform a thorough "pat down" on him which involves feeling around the pants, zipper, and making sure pockets are empty.

145.   Wackenhut is responsible for the acts of its employees (respondeat superior).

146.   As a result of the discrimination and harassment set forth in this Court, Plaintiffs have suffered severe emotional distress, intimidation, humiliation and embarrassment.

147.   Men similarly situated were not subjected to the treatment set forth in this Count.

148.   These actions set forth in this Count represent an intent by Wackenhut to discriminate against women on the conditions and terms of their employment and harass and intimidate them.  At the very least, they demonstrate a pervasiveness of such an attitude that their outrageousness and number indicates a reckless indifference by Wackenhut to prevent such activity.

## K. Hostile Work Environment:
### Plaintiffs Smith, Vredevelt & Williams

149.    In addition to instances of harassment contributing to a hostile work environment set forth above and in other counts, profane and sexual explicit language was common at the prison by the male prison guards. In the presence of women officers, the men made many comments which included connotations to the female body, i.e., cunt and pussy. Sometimes these comments were directed toward the female officers, but even when they were not, they still made the prison an undesirable place to work for a woman.

150.    This abusive language, in addition the other instances of discrimination, intentional infliction of emotional distress, and other acts set forth in this Amended Complaint in some and in part, made the work environment discriminatory against women and very stressful for a woman to work there to the point that Plaintiffs had no other choice but to discontinue their employment at Wackenhut (constructive discharge).


## L. Discrimination in Promotional Opportunity: Plaintiff Smith

151.    Plaintiff Pam Smith was also denied promotional opportunity because she was a woman.

152.    Plaintiff Smith desired to be on the CERT team. When she inquired about applying, Supervising Sgt. Cox said to Plaintiff Smith that women couldn't be on CERT. He said that women were not strong enough to do the job.

-24-

WHEREFORE, Plaintiffs Vredevelt, Williams, and Smith respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

## Count IX - Intentional Infliction of Emotional Distress On Erica Vredevelt

153.    Plaintiffs reallege and reincorporate by reference each and every allegation contained in Paragraphs 1 through 152 above as if fully set forth herein.

154.    The acts described elsewhere in this Amended Complaint were performed with the intent of inflicting severe emotional distress on Plaintiff Vredevelt.

155.    In addition to the already-described acts, Lt. Bosse, after removing Plaintiff Vredevelt from the CERT team, assigned Plaintiff Vredevelt to a cell block that housed an inmate that was known to be infatuated with her, a dangerous and stressful work environment.

156.    The acts discussed in this Amended Complaint were extreme and outrageous evidencing not only a lack of compassion and understanding for Wackenhut employees well-being, but outright intent to degrade and harass them.

157.    Plaintiff Vredevelt has suffered severe emotional distress as a direct result of Defendants' acts.

158.  This act contributed to the offensive atmosphere at Wackenhut resulting in her constructive discharge.

WHEREFORE, Plaintiff Vredevelt respectfully requests this Court to award monetary damages as it deems appropriate, including recovery for pain and suffering, wage losses, embarrassment, humiliation, degradation of reputation, attorneys' fees and any other relief this Court deems proper.

SCHENK & BONCHER

DATED: July 15, 2003

By: _____
Frederick J. Boncher (P23072)
Brent W. Boncher (P64832)
Attorneys for Plaintiffs Sable, Williams, Vredevelt, and Smith
Business Address:
601 Three Mile Road, N.W.
Grand Rapids, MI 49544-1601
(616) 647-8277

C:\U\LS40\BWB\Sable\Amended Complaint.wpd

-26-